448 P.2d 407

**Nathaniel RUSSELL, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona and City of Tucson, Respondents.**

**No. 1 CA–IC 176.**

Court of Appeals of Arizona.

Dec. 12, 1968.

Rehearing Denied Jan. 27, 1969.

Review Granted March 4, 1969.

Hirsch, Van Slyke & Ollason, by Lawrence Ollason, Tucson, for petitioner.

Robert D. Steckner, Chief Counsel, by Spencer K. Johnston, Tucson, for respondents.

STEVENS, Judge.

The basic question presented to this Court is whether there can be a finding of permanent physical injury of a non-schedule classification where the doctors are unable to fix a percentage of physical functional disability.

On 3 February, 1964, the petitioner was engaged in the performance of his official

duties as a police officer of the City of Tucson. He was injured under circumstances indicating a third party liability for the injuries. Reports were made to The Industrial Commission which assumed jurisdiction. The petitioner exercised election number 2, that is to say, he elected to pursue his remedies against the third party at the same time preserving certain rights before the Commission. The monetary results of that election are not reflected in the file.

The matter was administratively processed. The petitioner was seen by Dr. Fonseca, a neurological surgeon who rendered his report. Without a formal hearing The Industrial Commission entered its "Findings and Order" on 17 March, 1965. Paragraph three of the Findings is as follows:

> "That said applicant was discharged from medical treatment on March 1, 1965, with no permanent disability."

The order portion of the action taken on 17 March, 1965 is in part as follows:

> "IT IS ORDERED that this Commission reserves jurisdiction to determine if there is any deficiency between said applicant's entitlement under the provisions of the Arizona Workmen's Compensation Law and any recovery from the third party."

The order further contained a twenty-day clause.

Following the action of the Commission there was a timely petition for a hearing. These procedures occurred before Salmi v. Industrial Commission, 3 Ariz. App. 411, 415 P.2d 126 (1966), review denied, and Vidal v. Industrial Commission, 3 Ariz.App. 529, 416 P.2d 208 (1966), which pointed out that an injured employee is entitled to one formal hearing as a matter of right and that no grounds need be stated in the request, the only condition being that a timely request be presented.

Doctor Fonseca made a later report under date of 7 June, 1965, indicating that the petitioner's headaches were less frequent, "occurring only once a week or so" and that relief could generally be secured by the use of a non-prescription pain reliever. The doctor noted that the petitioner, "also had some chronic discomfort in the posterior neck which he describes as a tension sensation." The neurological examination was quite normal and the doctor found no limitation of motion of the cervical spine. The doctor attributed the petitioner's headaches to the injury and expressed the opinion that the headaches were improving and concluded by stating, "I think his case could be closed with no disability at the present time".

There was delay in conducting the formal hearing and on 19 January, 1966, Dr. Fonseca again wrote to The Industrial Commission, this time stating that:

> "This patient's headaches are persistent and recently they have become increasingly localized to the left posterior neck and shoulder and parascapular area in the form of pain and soreness, at times with superimposed shooting pains in this distribution.
>
> \*    \*    \*    \*    \*    \*
>
> "His neurological examination shows depressed reflexes throughout. There is no real limitation of motion of the cervical spine, but there is some pain on hyperextension and lateral tilting of the left, referred to the parascapular area and to the trapezius.
>
> \*  .  \*    \*    \*    \*    \*
>
> "It would appear now that the current symptoms are the result of a neck sprain sustained as a result of the injury of 2–3–64. The patient is no longer working for his previous employer and is now active in the Real Estate business."

The doctor inquired as to whether the claim was still open so that he could authorize treatment.

A hearing was held on 2 February, 1966, at which Dr. Fonseca testified indicating that he had never been informed by the Commission as to the status of the claim. In relation to the 19 January, 1966 examina-

tion of the petitioner, the doctor expressed the opinion that, "there had been a change in his condition which had a certain amount of chronological continuity with his pre-existent symptoms, which necessitated further evaluation and treatment." There is further testimony by the doctor to the same effect. When asked if he anticipated a permanent disability, he stated:

"I would say that he probably will not have a permanent disability. I think that he may have some tendency for an indefinite period of time to have recurrent discomfort in his neck, but I think that with the certain endoctrination (sic) in the management of this by the patient himself, such as exercises and traction and so on, that this could be kept under reasonable control."

After a recess of the same hearing, the petitioner testified as to the headaches and a left-shoulder problem. He testified that he had left the Police Department to enter the real estate business and resume his education.

Notwithstanding the fact that the doctor recommended further treatment and evaluation, The Industrial Commission took action on 3 May, 1966 entitled: "Decision Upon Rehearing and Findings and Award for New, Additional or Previously Undiscovered Disability". Therein it referred to the 17 March, 1965 action as "Findings and Award" and reaffirmed the same. By the action taken this date, the Commission further found that:

"1. That applicant's physical condition remained essentially the same between March 1, 1965 and January 19, 1966.

2. That applicant on or about January 19, 1966, suffered a change in physical condition, requiring additional medical treatment.

3. That said change in physical condition is not disabling and applicant

is able to continue in his regular employment.

4. That applicant has new and additional disability related to the industrial episode of February 3, 1964.

5. That applicant is entitled to further accident (medical) benefits only."

"ORDER

"IT IS ORDERED that the Findings and Award entered herein on March 17, 1965, be, and the same is hereby affirmed."

The Commission action contained a twenty-day clause. Without further formal Industrial Commission action, Dr. Fonseca was authorized to secure a consultation with Dr. Toll, an orthopedic surgeon. There were also X-rays and a myelogram. Dr. Toll's report is quoted in part as follows:

"It is my impression that this man sustained a cervical strain as a result of the accident in 1964 and he now presents with a mild residual of the same. I believe that no active treatment other than continued observation is indicated. He most probably will continue to have intermittent symptoms of neck pain with rotation as he describes and this may be permanent in degree."

In February 1967, a medical consultation was held in which Doctors Fonseca and Toll participated along with Dr. Derickson, an orthopedic surgeon and Dr. Moore, the Acting Medical Director of the Commission. We quote from the report of the consultation as follows:

"* * * Basically, his symptomatology remains identical. The symptoms are limited to the neck and do not extend into the arms in a radicular distribution. In conjunctions (sic) with his neck trouble he also has occipital headaches which come in clusters, lasting three, four or five days at a time.

\* \* \* \* \* \* \* ' \* \* \* ·· \*' \*

"COMMENTS: It is the opinion of the undersigned examiners the above named claimant's condition has reached a stationary level in recovery from the injury of 2–3–64. We acknowledge the patient has intermittent discomfort in his neck which can be attributed to the injury but we do not feel at this time we have enough physical evidence and abnormalities in physical examination to warrant stipulation of any percentage of physical disability. We do not believe he is disabled to perform the work he did at the time of the injury. The patient is to continue his program of exercises in which he has been adequately instructed.

"If, at some time in the future, his condition should deteriorate or should become worse it should be reopened for additional evaluation and possibly for treatment."

Thereafter formal hearings were held in which all of the participating doctors testified. Dr. Derickson testified that on the date of the examination the petitioner "had symptomatic residuals, and he was still complaining of occasional headaches," that he found relatively little from an objective standpoint and there was recorded a limitation of rotation of the petitioner's head to the right. He testified that at times the petitioner's neck was stiff and at times it was not. The limitation of motion was intermittent and in the opinion of the doctor this was not necessarily a permanent condition. He further testified:

"On the basis at times the range of motion is normal, so we have to take the optomistic standpoint that the condition is potentially one which can clear up—

\* \* \* \* \* \*

"the condition is changing back and forth, then you are a little bit hard put to say there isn't any chance for some permanent disability. . .

"We were not able to demonstrate any organic lesion that would be the basis for a permanent disability." ··

He testified that the myelogram which shows some ridging "could be compatible to injury, or with degenerative process of aging, or of previous injury." Petitioner then being 36 years of age.

Dr. Toll testified: .

"Q. And at that time you felt that there was no permanent disability, is that correct, or there was no permanent disability, is that correct, or there was no percentage of physical disability that you felt was permanent?

A. That was our final conclusion."

The doctor expressed the opinion that if there was to be disability there would be progression; that it was not possible to anticipate the rate of progression, "and I think in our consultation we sort of left a way out, recording that if there were progression of symptoms and findings, that the case could then subsequently be reopened for additional treatment as necessary".

"Q. It was not stationary on February 27th?

A. That's correct."

In explaining the report, the doctor stated:

"I think that at the time of that examination he could be considered stationary in terms of immediate treatment. \* \* \* that he was stationary in terms of not requiring immediate future treatment."

However, he qualified this in additional statements by saying that if he should become worse, if this should show progression, then the case could be reopened for further treatment.

In discussing the question of whether or not petitioner's condition was stationary, Dr. Fonseca stated that it was stationary "in a relative way". He further testified:

"A. You must realize that when we use the term stationary, it becomes,

in this type of work, somewhat of a legal technicality in a sense, because we have to determine when to stop treatment. You can't treat a patient forever, because they have a little soreness of the neck. So we have to say if he hasn't progressed any in the last year, the last six months, he is the same, so we say it's stationary now. That doesn't bar the man from having an acute exacerbation the day later or a year later or ten years later, but for administrative purposes, let's put it that way, we say that he is stationary.

"Q. Now, Doctor, you don't know that he will have an acute exacerbation in the future, this is something that may happen, is that correct?

"A. That's right. I have a little suspicion, however, that he will.

"Q. But when if, you don't know?

"A. I don't know."

At the time of the February 1967 consultation, the doctors did not believe that the claimant had a measurable physical disability and when asked how one measures a disability, the doctor answered:

"A. This is very relative, Mr. Ollason. I think this is a very ethereal sort of thing, very difficult to measure. As you know, administratively again, the physician is asked to measure disability when it's not limited to an extremity in terms of percentage of total general disability, and we naturally have to consider the man's occupation to measure that. For example, if a man had a little arthritis in one of the joints of one finger, he could not be a violinist, but he could be a very successful butcher. I felt that this man was having some pain in the neck, and he was having some headaches, but so do a lot us, and we still make a living. And I felt that it just wasn't enough to say that he

has ten percent or 20 percent or 100 percent.

"Q. Can you say one percent? I have never seen anybody that had one percent.

"A. No, we never have. I think the lowest we ever stipulated was five percent, and I think this again goes into a very subjective realm, you have to trust a physician's judgment. I think that there is a certain unknown factor that, from experience and so on, that we utilize in our judgment."

It is the observation of the Court from the review of a number of awards in non-scheduled injuries that the physical functional disability is usually stated in multiples of five.

On 5 October, 1967, the Commission rendered its "decision upon rehearing and final findings and award". It is this document which is the basis of the writ of certiorari now under consideration by this Court. The preliminary recitations contained in the October 1967 action of the Commission contain the following statements:

"Heretofore on May 3, 1966 this Commission entered herein Decision Upon Rehearing and Findings and Award for New, Additional or Previously Undiscovered Disability.

\*   \*   \*   \*   \*   \*

This Commission having reconsidered the file, evidence and testimony, now enters its Decision Upon Hearing and Final Findings and Award as follows:"

In part, the "findings" are as follows:

"1. That as a result of the industrial injury of February 3, 1964 the applicant has periodically and intermittently had symptoms of pain in the neck and headaches.

2. That said symptoms have not been and are not now disabling.

3. That the applicant has sustained no permanent disability as a result of his industrial injury of February 3, 1964.

4. That the applicant's condition became stationary on May 23, 1967, requiring no additional medical treatment, and the applicant is therefore entitled to medical benefits through May 23, 1967, in the sum of $695.22.

5. That the finding that the change of condition of January 19, 1966 was not disabling became res judicata.

6. That the applicant has not been disabled for work in excess of seven days as a result of said injury and is therefore not entitled to compensation.

7. That the Findings and Order of March 17, 1965 is supported by the evidence."

The "Award" portion thereof allows accident benefits and further provides:

"2. That in the event the amount actually collected from the third party is less than the benefits provided under the Workmen's Compensation Law, said applicant would be entitled to an award for the deficiency."

This indicates to the Court that the matter was not closed. This document contains a thirty-day clause. At this point, the Court concludes the background information and proceeds with the merits of the appeal.

■ Pursuant to A.R.S. § 23–951, this Court by certiorari, may review "the lawfulness of the Award". A.R.S. § 23–901 is a definitions section and subsection 1 thereof is as follows:

" 'Award' means the finding or decision of the commission of the amount of compensation or benefit due an injured employee or the dependents of a deceased employee."

Industrial Commission Rule 27 provides for two awards, one determining the amount of compensation payable and the other determining the amount of accident benefits payable. In Noblitt v. Industrial Commission, 6 Ariz.App. 303, 432 P.2d 162 (1967), review denied, we discuss the distinction between an "Award" and an "Order" both relating to compensation matters. We recognize that the fact situation in Noblitt differs from the fact situation now under consideration but in our opinion the discussion of the distinction is appropriate. Therein we stated on page 306, 432 P.2d on page 165 that "[t]he doctrine of res judicata does not extend to interim orders and interlocutory decrees". Article 8 of the Workmen's Compensation portion of the Code is entitled "Amount of Compensation". A.R.S. § 23–1044 relates to the computation of compensation for partial disability. Subsection B of this Section treats the subject of specific injuries which are commonly called "scheduled injuries". Subsection C thereof is as follows:

"C. In cases not enumerated in subsection B of this section, where the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability, but the payments shall not continue after the disability ends, or the death of the injured person, and in case the partial disability begins after a period of total disability, the period of total disability shall be deducted from the total period of compensation."

These injuries are commonly called "odd lot" or "unscheduled injuries".

■ It should be noted that there is no requirement that the Commission abstain from finding a permanent partial disability in the unscheduled injury classification in those cases where there is no loss of earning capacity. We recently affirmed an award of no loss of earning capacity in a case wherein an injured workman "suffered a 30% physical functional disability". McDaniel v. Industrial Commission, 8 Ariz. App. 303, 445 P.2d 860 (1968). We find no requirement that unscheduled physical functional disabilities must be expressed in a given percentage figure. In our opinion there can be minimal general physical func-

tional disability and if one has been established it should be declared even though the percentage, as here, is difficult to ascertain and even though there is no present loss of earning capacity. In Laird v. Industrial Commission, 8 Ariz.App. 196, 445 P.2d 79 (1968), The Industrial Commission found an increase in a previously established percentage physical functional disability and did not specify the percentage of increase. This is so because of the difference in the burden of proof placed upon an injured workman if his condition deteriorates and he thereafter seeks an increased rating or an award for loss of earning capacity.

### THE COMMISSION ACTION OF 17 March, 1965

The March 1965 action was not an award. It was merely an interim action holding the matter in abeyance pending final disposition of the personal injury action. In our opinion the quoted paragraph 3 of the findings is not a Commission finding that the petitioner sustained no permanent disability. We are not called upon to determine what the effect of this action might have been had the petitioner taken no further procedural steps before The Industrial Commission. A formal hearing was requested which was his right and under those circumstances all issues were open for consideration as of the date of the action taken after the formal hearing had been conducted. The hearing requested and conducted was not a "reopening" but was the proceeding leading to the first formal adjudication.

### THE COMMISSION ACTION OF 3 May, 1966

The referee and the Commission proceeded on the erroneous theory that the hearings leading up to this action were based upon a request for a finding of new, additional, or previously undiscovered disability.

The proceedings leading up to this action were for the purpose of making the original determination as to the petitioner's industrial situation, this being the first Commission determination in conjunction with the hearing, the first formal hearing, a hearing which was the petitioner's right. The Commission was in error in not authorizing full care and treatment by Dr. Fonseca prior to the hearing. The Commission was in error in enhancing the petitioner's burden as though he were seeking to reopen or to establish a new or previously undiscovered disability. There being no "Findings and Award" entered on 17 March, 1965 under the circumstances outlined in this opinion, the Commission was in error in affirming the so-called Findings and Award. It is clear that the action of 3 May, 1966, was an erroneous interim action in that without additional formal requests, the Commission proceeded to secure a more complete medical evaluation. This it was obligated to do prior to the entry of its initial findings and award following the completion of an adequate first formal hearing.

### THE ACTION OF 5 October, 1967

The evidence is clear that as of the date of the hearings the petitioner sustained a general physical functional disability albeit that the percentage was small and albeit that there was no demonstrated loss of earning capacity. Finding number 3 in relation to this action, which is quoted above, was not reasonably supported by the evidence. The action of the Commission in Finding number 5 purporting to find that the petitioner's condition as of 19 January, 1966, was res judicata was in error. Under the circumstances, Finding number 7 with reference to the action of 17 March, 1965, was in error.

The Award is set aside.

CAMERON, C. J., and DONOFRIO, J., concur.